IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GREGORY P. WEAVER, individually and on behalf of a class of those persons similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No.: |
| v. | ) ) | **CLASS ACTION** |
| NORTH AMERICAN POWER & GAS LLC | ) ) | |
| Defendant. | ) | |

Plaintiff Gregory P. Weaver ("Weaver" or "Plaintiff") brings this action against North American Power & Gas LLC ("NAP" or "Defendant"), by and through his attorneys, BROTSCHUL POTTS LLC, individually and on behalf of all others similarly situated, and alleges with personal knowledge as to his own actions, and upon information and belief as to those of others, as follows:

**Nature of the Case**

1.      This action seeks to redress NAP's deceptive pricing practices that have caused thousands of consumers to pay considerably more for their electricity than they should otherwise have paid.

2.      NAP engages in a classic bait-and-switch deceptive marketing scheme aimed at consumers hoping to save money on the cost of electricity.  NAP intentionally offers below-market fixed rates for electricity in order to entrap customers, with the expectation that a high proportion of customers will automatically and without affirmation renew into an exorbitant month-to-month

1

variable rate contract based on poorly defined factors that take several billing cycles to be recognized.

3.     NAP lures consumers into switching from the local utility's electric rate by offering a teaser rate that is fixed for a limited number of months and initially lower than local utility rates for electricity. Once that initial rate expires, NAP automatically switches its customers over to a "variable rate product" that "may vary from month-to-month based on NAP's assessment of applicable market conditions."

4.     A reasonable consumer thus expects that after the initial rate expires, he or she will receive a variable rate that might vary from the fixed rate that he or she was receiving, depending on whether market conditions have changed – *i.e.* a variable market rate. Thus, a reasonable consumer would expect that NAP's variable market rate would reflect market conditions, including wholesale market rates and conditions and the rates other market participants charge (including local utilities).

5.     These representations by NAP are misleading.  What NAP does not inform customers is that its variable rate is invariably substantially higher than the initial teaser rate, that it does not fluctuate based on changes in the wholesale market, and that it does not vary according to other market rates because NAP's rate is significantly higher than the rates local utilities charge and the rates most other suppliers charge (including NAP's own fixed rates).

6.     Plaintiff and reasonable consumers were misled and deceived because NAP's variable rate never materially varies based on market conditions, because the variable rate does not vary based on changes in competitors' rates, and it does not vary based on changes in wholesale rates. Instead, NAP raises the rate as high as it thinks it can without causing its customers to quit

and it leaves the rate high no matter what happens with its competitors' rates or wholesale market rates. A reasonable consumer would not expect there to be no connection between market conditions and NAP's variable rates.

7.      NAP's rates go up to match increases in the underlying market price.  However, when the market price decreases, NAP's rate remains at an artificially inflated rate several times higher than the market rate.  This practice allows NAP to capture all of the benefit of the changing market prices for electricity while placing all of the risk on its consumers.  This scheme and practice of charging inflated electricity prices that match increases in the underlying market price while failing to pass along decreases to the consumers is intentionally designed to maximize revenue and profit for NAP.

8.      As a result, consumers are being fleeced millions of dollars in exorbitant charges for electricity.

9.      This suit is brought pursuant to the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01 et *seq*., and common law on behalf of a class of consumers who purchased electricity with a variable rate from Defendant from June 10, 2017 to the present. It seeks*, inter alia*, injunctive relief, actual damages and refunds, treble damages, attorneys' fees, and the costs of this lawsuit.

**<u>Parties</u>**

10.      Plaintiff Gregory Weaver is a citizen of Ohio residing in Pepper Pike, Ohio. Mr. Weaver was a NAP customer for electricity from June 2017 to April 2018. As a result of NAP's deceptive conduct, he incurred excessive charges for electricity.

3

11. Defendant North American Power & Gas LLC is a limited liability company organized under the laws of Delaware, with its principal place of business located at 20 Glover Avenue, Norwalk, Connecticut, 06851. NAP is a retail energy supplier, providing electricity services to residential customers in the United States, including the State of Ohio, where it is currently licensed to operate. NAP has thousands of customers in Ohio, and it has hundreds of millions of dollars in combined revenues.

## Jurisdiction and Venue

12. Jurisdiction in this civil action is authorized pursuant to 28 U.S.C. § 1332(d), as this is a class action filed under Rule 23 of the Federal Rules of Civil Procedure, there are members of the Class who are citizens of different state than NAP, there are more than 100 class members, and the amount in controversy exceeds $5,000,000.

13. This Court has personal jurisdiction over Defendant. Defendant does business in Ohio through continuous, permanent and substantial activity in Ohio. Defendant maintains sufficient contacts in this jurisdiction, including the advertising, marketing, distribution and sale of electricity to Ohio consumers.

14. Venue is proper pursuant to 15 U.S.C. § 80b-14 and 28 U.S.C. § 1391. Defendant regularly transacts and solicits business in this District, and Plaintiff resides in this District.

## Operative Facts

15. Prior to 1999, the State of Ohio had eight investor-owned utilities that provided more than 90% of the state's power, controlling how Ohio's energy was generated, transmitted, and distributed to residents and businesses.

4

16.     In 1999, Ohio passed Senate Bill 3 (SB3), which restructured the electric utility industry within the State of Ohio. Among the goals of SB3 were increased competition and deregulation within the industry, with an eye towards achieving greater consumer choice and an overall reduction of energy rates.  As a result, Ohio's electric industry is open to competition, and consumers may choose their supplier of electricity.

17.     The new energy suppliers, called Certified Retail Energy Suppliers ("CRES") compete against local utilities such as Illuminating Company, Ohio Edison, and Duke Energy. While CRESs supply the power, the actual delivery of electricity to homes remains the job of the local utilities.

18.     As part of Ohio's deregulation plan, CRESs, such as Defendant, do not have to formally file with the Public Utilities Commission of Ohio ("PUCO") the electricity rates they charge or the method by which they set their rates, but are subject to the regulatory requirements of Chapter 4901:1-21 of the Ohio Administrative Code governing Competitive Retail Electric Suppliers.

19.     CRESs play a middleman role: they purchase energy directly or indirectly from companies that produce energy and sell that energy to end-user consumers.  CRESs do not deliver energy to consumers.  Rather, the companies that produce energy deliver it to consumers' utilities, which in turn deliver it to the consumer.  CRESs merely buy electricity at the wholesale rate and then sell that electricity to end-users with a mark-up.  Thus, CRESs are essentially brokers and traders: they neither make nor deliver electricity, but merely buy from a producer and resell it to consumers.

5

20.     If a customer switches to a CRES, the customer will have his or her energy "supplied" by the CRES, but still "delivered" by the existing utility.  The customer's existing utility continues to bill the customer for both the energy supply and the delivery costs.  The only difference to the customer is which company sets the price for the customer's energy supply.

21.     NAP takes advantage of the lack of regulatory oversight in the Ohio energy market to deceptively charge consumers exorbitant rates for electricity.  In fact, NAP's rates are substantially higher than rates of other retail electric suppliers, local utilities, and the wholesale market rates.

22.     The result is that, instead of benefitting from switching to NAP, a typical consumer loses out – usually in the hundreds or even thousands of dollars per year.  Thus, NAP deceptively causes its consumers to pay considerably more for electricity services than they should have paid.

23.     Upon information and belief, in 2017, NAP had in excess of $15,000,000 in revenue from the supply of electricity to more than 17,000 residential consumers in Ohio.[1]

**Weaver's Relationship with NAP**

24.     NAP engaged in a deceptive scheme that lured Weaver into switching to its electricity supply service by offering him a fixed rate that was lower than his then-current rate with his local utility, Illuminating Company ("Illuminating"), and he accepted the offer. Weaver stayed on that fixed rate for six months before he was automatically, and without proper notice, switched to NAP's standard variable rate.  Not surprisingly, the rate NAP charged after he was moved to the

---

[1] *See* U.S. Energy Information Administration website, https://www.eia.gov/electricity/data/eia861/

variable rate was always substantially higher than his initial rate, the rates Illuminating Company charged, and the rates other electricity suppliers charged.

25.     Weaver learned of NAP through the PUCO website and its "Apples to Apples" comparison tool.  The PUCO comparison tool feature allows a consumer to check general contract terms for a particular supplier (e.g. price per kilowatt-hour, rate type, % of renewable energy, term length, early termination fee and promotional offers), and compare plan differences between energy suppliers.

26.     In April 2017, the PUCO website contained information for various NAP electricity supply plans; however, it did not contain any reference to a NAP variable rate plan and did not state that Weaver would be transferred to a variable rate plan after the completion of their advertised contracts.

27.     Upon information and belief, in April 2017 the information contained on the PUCO website and in the "Apples to Apples" comparison tool was provided directly by NAP to PUCO for inclusion on the website.

28.     In April 2017, the prices charged by the Ohio electric utilities, including Illuminating, as well as the prices charged by other CRES, were contained on the PUCO website and were publicly available to NAP.

29.     In April 2017, Weaver entered into a contract with NAP for the supply of electricity at a fixed-rate of $0.0479/kWh for a period of six months.

30.     Weaver had previously been paying $0.0489/kWh for electricity.  Weaver decided to switch to NAP due to the lower fixed rate electricity price as advertised by NAP.

31.     After Weaver agreed to enroll in NAP's electricity service, NAP provided him its standard "Terms of Service."   (*See* attached Exhibit 1). The Terms of Service is the contract between Plaintiff and Defendant.

32.     The Terms of Service provided that after the expiration of the introductory fixed rate, Plaintiff would be on a "variable month to month" contract. NAP also represented that the variable rate may "vary based on NAP's assessment of applicable market conditions…"  That is, NAP represented that the new variable rate might vary from the fixed rate that just expired according "to applicable market conditions." Thus, a reasonable consumer would expect either that the rate would remain the same as the fixed rate or that it would vary based on changes in market conditions (namely, wholesale market costs and conditions, the rates charged by other CRESs or rates charged by the local utility).

33.     Further, the Terms of Service provide that NAP may, in its sole discretion, elect to adjust the price of electricity in some circumstances, namely if the utility or other governmental or regulatory entity materially changed it prices.

34.     NAP sent Weaver a letter dated April 26, 2017, memorializing the fixed rate of 4.79c/kWh ("Introductory Letter") (*See* attached Exhibit 2). The Introductory Letter does not mention or reference that Weaver would be transferred without affirmation to a variable rate at the conclusion of the six-month fixed-rate contract.

35.     The initial contracted fixed-rate became effective in June 2017 and lasted for a period of six months, expiring at the end of November 2017.

36.     During the introductory period, Weaver received regular monthly electronic communications from NAP, although the only time a price is mentioned was in the Introductory Letter and accompanying email.

37.     During the introductory period, Weaver accessed his account and contract information online through the links provided by NAP in his enrollment email.

38.     After the introductory period ended, Weaver was not able to review online future variable rates to be charged by NAP.

39.     At no time during the fixed rate period did NAP send any correspondence, electronic communication, or otherwise notify Weaver that he was going to be switched to a variable rate plan after the first six months of service.

40.     After the first six months of service, Weaver was switched by NAP to NAP's Variable Rate. Immediately, NAP's rate jumped a remarkable 106% from $0.048 to $0.099 per kWh.

41.     Weaver was switched to a Variable Rate Plan by NAP with the billing period beginning on November 29, 2017.  After this, NAP ceased sending him regular monthly electronic communications about the rates he was being charged and the status of his account.  Further, the NAP variable rate was reported in very small font on the monthly billing statement from the local utility, without any reference to past rates or planned future rate increases.  Weaver did receive an additional email communication from NAP, on or about January 31, 2018, but it stated nothing about a change to a variable rate plan and contained no pricing information.

42.     In contrast, Illuminating's rate, *i.e.* the rate Illuminating would have charged Weaver had he not entered into a fixed rate contract with NAP, decreased during the time Weaver

9

was on NAP's Variable Rate Plan.  For the period ending November 28, 2017, Illuminating's rate was $0.0591/kWh and in April 2018 the Illuminating rate was $0.0559/kWh.

43.     NAP's variable rates stayed substantially higher than Illuminating's rates for the rest of Weaver's service period.  On average, they were significantly higher, with NAP rates increasing regularly by $0.01/kWh per month (ranging from $0.0999/kWh to $0.1299/kWh) while Illuminating's rates fluctuated monthly, albeit trending downward, ranging from $0.0591 in November 2017 to $0.0559 in April 2018.  From November 29, 2017, through April 26, 2018, NAP's Variable Plan Rates were substantially higher than Illuminating's rate for all of the billing periods.

44.     Moreover, NAP's Variable Rate was also consistently and substantially higher than other electricity rates available in the market, including its own fixed rates and introductory rates.

45.     In fact, after the abrupt 106% rate hike in the 7th month of service, the price per kilowatt hour that NAP charged continued to increase through the end of the service.   Thus, for the entire service period, NAP's rates increased by approximately 171%, from $0.0479/kWh to $0.1299/kWh.

46.     Weaver suffered an ascertainable monetary loss in the amount of $633.96 based on the difference in the rate he was charged versus the rate he would have been charged had NAP charged a rate based on market conditions or had he not switched to NAP from his previous supplier.

47.     At no time did NAP charge a variable rate less than $0.0999/kWh. Remarkably, NAP never lowered its rate from the preceding month, in contrast to fluctuating market conditions,

demonstrating that NAP's representation that the rates "may" vary according to market conditions is false and misleading.

48.    After the first six months of service, NAP's variable rates were always significantly higher than Illuminating's rate; indeed, while Illuminating's rates declined during those six months, NAP's rates increased.  Additionally, the same market conditions that caused NAP's Variable Rates to increase by nearly 200% had almost no impact on the NAP's fixed-rate they continued to post on the PUCO website twice a month.

49.    Interestingly, after Weaver first complained to NAP about the variable rate, on or about April 3, 2018, the monthly NAP charge did not appear on his next monthly bill from the utility.

50.    However, on the following monthly bill, dated May 1, 2018, NAP again increased its variable rate, this time to $0.1299/kWh.   The variable rate stayed the same for the next two months, with no increase.   Thus, NAP's Variable Rate Plan is not in fact based on market conditions or competing prices otherwise available in the market.

51.    A reasonable consumer would understand that the price the local utility charges and market rates are part of prevailing market conditions and that a price based on prevailing market conditions would be competitive with the price charged by the local utility and other retail market rates.  But NAP's Variable Rate was never competitive with Illuminating's rate.

52.    A reasonable consumer would understand and expect that market conditions for retail electricity would include the wholesale price for electricity, that is, the price that NAP pays for the electricity it in turn supplies to its retail customers.

53.     No reasonable consumer who is told that their variable rate may vary according to market conditions would expect that NAP's Variable Rate would consistently increase despite decreases in the wholesale price of electricity.

54.     All that NAP offers customers is electricity delivered by local utilities, a commodity that has the exact same qualities as electricity supplied by other CRESs or local utilities. Other than potential price savings, NAP offers nothing of value that other CRESs or local utilities do not offer.

55.     NAP's statements regarding its electricity rates are materially misleading, as the most important consideration for any reasonable consumer when choosing an energy supplier is price. No reasonable consumer who knows the truth about NAP's planned exorbitant rate increases would choose NAP as an electricity supplier. Other than potential price savings, there is nothing to differentiate NAP from other CRESs or local utilities, and the potential for price savings is the only reason any reasonable consumer would enter into a contract for electricity supply with NAP.

56.     NAP knows full well that it charges variable rates that are unconscionably high, and the misrepresentations it makes with regard to the rates being based on market conditions were made for the sole purpose of inducing customers to purchase electricity from NAP so that it can reap outrageous profits to the direct detriment of consumers without regard to the consequences high utility bills cause such consumers.  Therefore, NAP's actions were actuated by actual malice or accompanied by wanton and willful disregard for the well-being of consumers.

## Class Action Allegations

57.     Plaintiff brings this action individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class of all persons who were variable rate electricity

customers of Defendant in the State of Ohio from June 10, 2017, to the present ("Class" or "Class Members").

58.     Excluded from the Class is Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise control or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant.

59.     This action is brought as a class action for the following reasons:

a.      The Class consists of thousands of persons and is therefore so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

b.      There are questions of law or fact common to the Class that predominate over any questions affecting only individual members, including:

   i.      whether Defendant violated The Ohio Consumer Sales Practices Act, Ohio Rev. Code §1345.01 *et seq.*;

   ii.     whether Defendant breached its contracts with consumers by charging variable rates not based on market conditions;

   iii.    whether Defendant breached the covenant of good faith and fair dealing by exercising its unilateral price-setting discretion in bad faith, *i.e.* to price gouge or upset the reasonable expectation of consumers that NAP variable rates would be competitive and reflect changes in the wholesale price of electricity;

   iv.     whether Plaintiff and the Class have sustained damages and, if so, the proper measure thereof; and

   v.      whether Defendant should be enjoined from continuing to charge exorbitant rates based on factors other than market conditions.

c.      The claims asserted by Plaintiff are typical of the claims of the members of the Class;

d.   Plaintiff will fairly and adequately protect the interests of the Class, and Plaintiff has retained attorneys experienced in class and complex litigation, including class litigation involving consumer protection;

e.   Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendant;

f.   Defendant has acted on grounds that apply generally to the Class, namely representing that its variable rates are based on market conditions when its rates are in fact always substantially higher, so that final injunctive relief prohibiting Defendant from continuing its deceptive practices is appropriate with respect to the Class as a whole;

g.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

    i.   Absent a class action, Class Members as a practical matter will be unable to obtain redress, Defendant's violations of its legal obligations will continue without remedy, additional consumers and purchasers will be banned, and Defendant will continue to retain its ill-gotten gains;

    ii.   It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions;

    iii.   When the liability of Defendant has been adjudicated, the Court will be able to determine the claims of all members of the Class;

    iv.   A class action will permit an orderly and expeditious administration of Class claims, foster economies of time, effort, and expense, and ensure uniformity of decisions;

    v.   The lawsuit presents no difficulties that would impede its management by the Court as a class action; and

    vi.   Defendant has acted on grounds generally applicable to Class Members, making class-wide monetary and injunctive relief appropriate.

60.     Defendant's violations of the OCSPA (Ohio Rev. Code §1345 et seq.) and the common law are applicable to all members of the Class, and Plaintiff is entitled to have Defendant enjoined from engaging in illegal and deceptive conduct in the future.

### FIRST CAUSE OF ACTION
### (Violation of Ohio Rev. Code ("ORC") §1345.01 *et seq.*)

61.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

62.     The Ohio Consumer Sales Practices Act ("CSPA") prohibits, *inter alia*:

> No Supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction.  Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction. Ohio Rev. Code §1345.02(A).

63.     Plaintiff brings this claim on behalf of putative Class Members who were NAP variable rate electricity customers from June 10, 2017, to the present.

64.     The CSPA was originally enacted in 1972 to give consumers remedies where the common law fell short and to protect consumers from shoddy work, deceptive advertising and one-sided contracts.  It was also enacted to protect consumers from suppliers who engage in deceptive and unconscionable acts or practices.

65.     The Class Members are consumers for the purposes of ORC § 1345.01 *et. seq.*

66.     Defendant is a person and a supplier for purposes of ORC § 1345.01 *et seq.*

67.     The purchase and sale of Defendant's variable rate electricity plans is a "consumer transaction" as defined by ORC § 1345.01(a) *et seq.*

68.     The types of practices as alleged herein have already been found to be a violation of ORC § 1345.01 et. seq. by Ohio courts.  *See State of Ohio, ex rel. Jim Petro Attorney General*

*of Ohio v. Level Propane Gases, Inc.*, 01-CVH 01-018, Agreed Entry & Order dated November 24, 2003 (Common Pleas Court, Delaware County, Ohio) (See attached Exhibit 3).

69.     The *Level Propane* decision is publicly available on the Ohio Attorney General Online Public Inspection File ("OPIF") and is accessible under the "Energy" tab.

70.     The Defendant engaged in conduct that was substantially similar to conduct that was found to be deceptive in the *Level Propane* decision.

71.     Defendant's actions violated the CSPA in the following manner:

        a.      Defendant knew at the time it entered into the consumer transaction with Plaintiff and Class Members that the variable price of electricity would be substantially in excess of the price at which similar services were readily available in similar consumer transactions by like consumers in violation of ORC § 1345.03(B)(2).

        b.      Defendant knew that the terms of the consumer transactions with Plaintiff and Class Members were substantially one-sided in favor of Defendant in violation of ORC § 1345.03(B)(5).

        c.      Defendant committed an unfair, deceptive, and unconscionable act by incorporating in its consumer contract with Plaintiff and Class Members a provision that permits the Defendant to unilaterally modify the contract in violation of ORC §§ 1345.02 and 1345.03.

        d.      Defendant failed to incorporate all material terms in its contracts with Plaintiff and Class Members regarding the price and the market conditions upon which the price of electricity was based in violation of ORC § 1345.02.

        e.      Defendant committed an unfair, deceptive, and unconscionable act by marketing to Plaintiff and Class Members that its price was based on market conditions

16

when in fact it was not based on market conditions and was substantially higher than its competitors in violation of ORC §§ 1345.02(A) and 1345.02(B)(8).

       f.     Defendant committed an unfair, deceptive, and unconscionable act by making an offer for the sale of electricity in written or printed advertising or promotional literature without stating clearly and conspicuously in close proximity to the word stating the offer any material exclusions, reservations, limitations, modifications, or conditions to the offer in violation of ORC § 109:4-3-02.

72.     Defendant's misrepresentations and false, deceptive, and misleading statements with respect to the rates charged for electricity, as described above, constitute affirmative misrepresentations in connection with the marketing, advertising, promotion, and sale of electricity in violation of the CSPA.

73.     Defendant's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to purchase electricity from Defendant.

74.     Defendant failed to inform customers that its rates are substantially higher than those based on market conditions and the wholesale price of energy. That information would have been material to any consumer deciding whether to purchase electricity from Defendant.

75.     Defendant made these false, deceptive, and misleading statements and omissions with the intent that consumers rely upon such statements.

76.     Plaintiff and the other members of the Class entered into agreements to purchase electricity from Defendant and suffered ascertainable loss as a direct and proximate result of Defendant's actions in violation of the Ohio Consumer Sales Practices Act.

77.     As a consequence of Defendant's wrongful actions, Plaintiff and the other members of the Class suffered an ascertainable monetary loss based on the difference in the rate they were

charged versus the rate they would have been charged had Defendant charged a rate based on market conditions or had they not switched to Defendant from their previous supplier.

78.     Plaintiff and other members of the Class suffered an ascertainable loss caused by Defendant's misrepresentations and omissions because they would not have entered into an agreement to purchase electricity from Defendant if the true facts concerning its rates had been known.

79.     By reason of the foregoing, Defendant is liable to Plaintiff and the other members of the Class for trebled compensatory damages; attorneys' fees; and the costs of this suit.  Ohio Rev. Code §§ 1345.09.

80.     Defendant knows full well that it charges variable rates that are unconscionably high, and the misrepresentations it makes with regard to the rates being based on market conditions were made for the sole purpose of inducing consumers to purchase electricity from it so it can reap outrageous profits to the direct detriment of Ohio consumers and without regard to the consequences high utility bills cause such consumers. Defendant's conduct was intentional, wanton, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to the Plaintiff and the other members of the Class.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

81.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

82.     Plaintiff and the Class entered into valid contracts with Defendant for the provision of electricity supply.

83.     Pursuant to that contract, NAP agreed to charge a variable rate for electricity "according to market conditions."

84.     Pursuant to the contract, Plaintiff and the Class agreed to pay Defendant's variable rate, and they did so.

85.     However, Defendant failed to perform its obligations under the contract because it charged a variable rate not based on market conditions, including the wholesale price of energy.

86.     Plaintiff and the Class were damaged as a result because they were billed, and they paid, a charge for electricity that was higher than it would have been had Defendant based the rate on market conditions, including the wholesale price of energy.

87.     By reason of the foregoing, Defendant is liable to Plaintiff and the rest of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

## THIRD CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith & Fair Dealing)

88.     Plaintiff repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

89.     Every contract contains an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of a contract's express terms.

90.     Under its agreements, Defendant had unilateral discretion to set the variable rate for electricity based on market conditions, including the wholesale price of energy.

91.     Plaintiff reasonably expected that Defendant would attempt to make a reasonable profit in setting its rates and selling electricity to consumers.  Nonetheless, Plaintiff reasonably expected that the variable rates for electricity would, notwithstanding Defendant's profit goals, reflect market conditions, including competing rates and the wholesale price of electricity, and that

Defendant would refrain from price gouging. Without these reasonable expectations, Plaintiff and other Class members would not have agreed to buy electricity from Defendant.

92.      Defendant breached the implied covenant of good faith and fair dealing by arbitrarily and unreasonably exercising its unilateral rate-setting discretion to price gouge and frustrate Plaintiff and other Class Members' reasonable expectations that the variable rate for electricity would reflect market conditions, including competing rates and the wholesale price of electricity.

93.      As a result of Defendant's breach, Defendant is liable to Plaintiff and other Class Members for actual damages in an amount to be determined at trial and attorney's fees.

WHEREFORE, Plaintiff respectfully requests that the Court should enter judgment against Defendant as follows:

a.      Certifying this action as a class action, with a class as defined above;

b.      On Plaintiff's First Cause of Action, awarding against Defendant damages that Plaintiff and the other members of the Class have suffered, trebled, and granting appropriate injunctive relief;

c.      On Plaintiff's Second Cause of Action, awarding against Defendant damages that Plaintiff and the other members of the Class have suffered as a result of Defendant's actions;

d.      On Plaintiff's Third Cause of Action, awarding against Defendant damages that Plaintiff and other members of the Class have suffered as a result of Defendant's actions;

e.      Awarding Plaintiff and the Class trebled damages;

f.      Awarding Plaintiff and the Class interest, costs and attorneys' fees; and

       g.     Awarding Plaintiff and the Class such other and further relief as this Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Federal Rule of Civil Procedure Rule 38, Plaintiff hereby demands a trial by Jury.

Dated: June 10, 2019               **BROTSCHUL POTTS LLC**

                          By:   */s/ Keith L. Gibson*
                               Keith L. Gibson (OH Bar #0067792)
                               BROTSCHUL POTTS LLC
                               30 North LaSalle Street
                               Suite 1402
                               Chicago, Illinois 60602
                               Phone: (312) 551-9003
                               Fax: (312) 277-3278
                               kgibson@brotschulpotts.com

                               *Attorneys for Plaintiff and the Putative Class*