## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| GREGORY P. WEAVER, individually and on behalf of a class of those persons similarly situated | ) ) ) | CASE NO: 1:19-cv-01339 |
| | ) | JUDGE DAN AARON POLSTER |
| Plaintiff, | ) ) ) | MAGISTRATE JUDGE JONATHAN D. GREENBERG |
| v. | ) ) | |
| NORTH AMERICAN POWER & GAS LLC, | ) ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

This case is before the Court upon referral for general pretrial supervision.  (Doc. No. 4.)

Currently pending is the Defendant's Motion to Dismiss Plaintiff's Complaint.  (Doc. No. 7.)

For the following reasons, it is recommended that Defendant's Motion to Dismiss be

GRANTED IN PART and DENIED IN PART.  The Motion to Dismiss Plaintiff's Complaint based

on a lack of jurisdiction should be DENIED.  The Motion to Dismiss the first count of Plaintiff's

Complaint, alleging a violation of the CSPA, should be GRANTED.  The Motion to Dismiss the

second and third counts of Plaintiff's Complaint, alleging breach of contract and breach of the

covenant of good faith and fair dealing, should be DENIED.

### I.  Procedural Background

On June 10, 2019, Plaintiff Gregory Weaver ("Plaintiff" or "Weaver") filed a class action

against Defendant North American Power and Gas, LLC ("Defendant" or "NAPG"), alleging

violations of Ohio Revised Code ("ORC") § 1345.01 *et seq.*, which prohibits unfair or deceptive acts

or practices in consumer transactions; breach of contract; and breach of implied covenant of good

faith and fair dealing. (Doc. No. 1.)

On August 9, 2019, NAPG filed a Motion to Dismiss Plaintiff's Complaint, alleging lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and failure to state a claim under Fed. R. Civ. P. 12(b)(6). (Doc. No. 7.)

On September 23, 2019, Weaver filed a Response in Opposition to NAPG's Motion to Dismiss, arguing that the Court has jurisdiction over his claims and that he adequately pled sufficient facts to support his claims. (Doc. No. 15.)

On October 17, 2019, NAPG filed a Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss. (Doc. No. 18.)

## II. Factual Allegations

The Complaint (Doc. No. 1) contains the following factual allegations:

NAPG, a limited liability company organized under the laws of Delaware and headquartered in Connecticut, is a Certified Retail Energy Supplier ("CRES"), as defined in Ohio Rev. Code § 49028.01(A)(27).[1] (Doc. No. 1 at 4-5.) CRES were authorized under Senate Bill 3, passed in 1999, which had among its goals increased competition and deregulation in the energy industry. (*Id.* at 5.)

As a CRES, NAPG functions as a broker: it purchases energy directly or indirectly from a company that produces energy and resells the energy to end-use consumers. It does not directly

---

[1] "'Retail electric service' means any service involved in supplying or arranging for the supply of electricity to ultimate consumers in this state, from the point of generation to the point of consumption. For the purposes of this chapter, retail electric service includes one or more of the following 'service components': generation service, aggregation service, power marketing service, power brokerage service, transmission service, distribution service, ancillary service, metering service, and billing and collection service." Ohio Rev. Code § 4928.01 (2019).

2

participate in either the production or delivery of the energy.  (*Id.*)

The Public Utilities Commission of Ohio ("PUCO") does not require CRESs to file the electricity rates they charge or the method by which they set those rates, but does regulate CRESs under Chapter 4901:1-21 of the Ohio Administrative Code. (*Id.*)

NAPG charges electricity rates that are substantially higher than the rates of other CRESs, local utilities, and wholesale market rates.  (*Id.* at 6.)  It induces customers to contract for electricity by offering a low fixed rate for the initial period of service, then inflates its rates without notifying customers.  (*Id.*)

Weaver, a resident of Pepper Pike, Ohio, was a customer of NAPG from June 2017 to April 2018.  (*Id.* at 3.)  In April 2017, Weaver contracted with NAPG for the supply of energy at a fixed rate of $0.0479/kWh for a period of six months beginning in June 2017.  (*Id.* at 7.)  He had previously been paying $0.0489/kWh through his local utility.  (*Id.*)

Weaver used the PUCO website's "Apples to Apples" rate comparison feature to select NAPG.  (*Id.*)  Neither the PUCO website nor the letter NAPG sent to Weaver on April 26, 2017, mentioned NAPG's variable rate plan, or explained that after the initial six-month period, Weaver would be transferred to that plan.  (*Id.* at 7-8.) However, the "Terms of Service" provided to Weaver after he agreed to enroll in NAPG's service, which constitute the contract between Weaver and NAPG, states that after the expiration of the six month period, Weaver would be on a "variable month to month" contract.  (*Id.* at 8.)  It also stated that the new variable rate might vary from the fixed rate according to "applicable market conditions."  (*Id.*)

Weaver's six-month period expired at the end of November 2017.  (*Id.*)  The following month, Weaver was charged $0.099/kWh.  (*Id.* at 9.)  NAPG's rates continued to increase, usually

by $0.01 per kWh per month, and eventually reached $0.1299/kWh before Weaver terminated his service.  (*Id.* at 10.)  During the same period, the local utility's rates fluctuated but generally declined, ranging from $0.0591/kWh to $0.0559/kWh.  (*Id.*)

### III.  Motion to Dismiss

#### A.      Standard of Review

Defendant challenges Plaintiff's Complaint under Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6).

Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of a complaint over which the Court lacks subject matter jurisdiction.  "Where subject matter jurisdiction is challenged pursuant to 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Mich. S. R.R. Co. v. Branch & St. Joseph Counties Rail Users Ass'n, Inc.*, 287 F.3d 568, 573 (6th Cir. 2002).  Rule 12(b)(1) motions to dismiss based upon subject matter jurisdiction generally come in two varieties.  *See Metheney v. United States*, No. 1:16–CV–2398, 2017 WL 2105303, at *1 (N.D. Ohio May 12, 2017).  "A facial attack on the subject matter jurisdiction alleged by the complaint merely questions the sufficiency of the pleading.  In reviewing such a facial attack, a trial court takes the allegations in the complaint as true, which is a similar safeguard employed under 12(b)(6) motions to dismiss." *McGuire v. Ameritech Servs.*, 253 F. Supp. 2d 988, 993–94 (S.D. Ohio 2003) (quoting *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)).  *See also Machisa Design Servs., Inc. v. Board of Educ. Of School Dist. of the City of Columbus*, No. 2:12–cv–838, 2013 WL 80273, at *2 (S.D. Ohio Jan. 7, 2013).  In contrast, a factual challenge "is not a challenge to the sufficiency of the pleading's allegations, but a challenge to the factual existence of subject matter jurisdiction.  On such a motion, no presumptive truthfulness

4

applies to the factual allegations and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994) (citations omitted). *See also Metheney*, 2017 WL 2105303, at *1.

Under Fed. R. Civ. P. 12(b)(6), the Court accepts the plaintiff's factual allegations as true and construes the complaint in the light most favorable to the plaintiff. *See Gunasekara v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009). In order to survive a motion to dismiss under this Rule, "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting in part *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

The measure of a Rule 12(b)(6) challenge—whether the complaint raises a right to relief above the speculative level—"does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Bassett v. National Collegiate Athletic Ass'n.*, 528 F.3d 426, 430 (6th Cir.2008) (quoting in part *Twombly*, 550 U.S. at 555–556, 127 S.Ct. 1955). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2)

5

requires only a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Gunasekera*, 551 F.3d at 466 (quoting in part *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007)) (quoting *Twombly*, 127 S.Ct. at 1964). Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937.

## C.     PUCO

Defendant's first ground for dismissal of Weaver's Complaint is that this Court lacks jurisdiction over Weaver's claims because they all concern rates, rules, and business practices relating to the sale of electricity, which fall squarely under the exclusive jurisdiction of PUCO. (Doc. No. 7 at 5.)  Weaver contends that, while PUCO has exclusive jurisdiction over rates, rules, and business practices relating to the sale of electricity by public utilities, that jurisdiction does not extend to CRESs.  (Doc. No. 15 at 9-10.)

CERSs are certified by PUCO and are subject to PUCO's supervision under Ohio Revised Code sections 4928.01, *et seq.,* 4901.01 *et seq.*, and 4928.08 *et seq.*   However, certain exceptions to PUCO's authority over CRESs are carved out by statute.  Ohio Rev. Code § 4928.05(A)(1) states in pertinent part that:

> On and after the starting date of competitive retail electric service, a competitive retail electric service supplied by an electric utility or electric services company shall not be subject to supervision and regulation . . . by the public utilities commission under Chapters 4901 to 4909, 4933, 4935, and 4963 of the Revised Code, except sections 4905.10 and 4905.31, division (B) of section 4905.33, and sections 4905.35 and 4933.81 to 4933.90; except sections 4905.06, 4935.03, 4963.40, and 4963.41 of

6

the Revised Code only to the extent related to service reliability and public safety;
and except as otherwise provided in this chapter.

Ohio Rev. Code § 4928.05 (2008).   These designated areas where PUCO retained "supervision and

regulation" address the relationship between CRESs and the public utilities which provide and

deliver the electricity.[2]

The statue also contains an express grant of jurisdiction.  Ohio Rev. Code §  4928.16(A)(1)

states that:

The public utilities commission has jurisdiction under section 4905.26 of the Revised
Code, upon complaint of any person or upon complaint or initiative of the
commission on or after the starting date of competitive retail electric service,
regarding the provision by an electric utility, electric services company, electric
cooperative, or governmental aggregator subject to certification under section
4928.08 of the Revised Code of any service for which it is subject to certification.

Ohio Rev. Code §  4928.16 (1999).   Ohio Rev. Code §  4901.1-21-02(D), which sets forth the

"purpose and scope" of CRESs, states that "[t]he rules in this chapter shall not relieve CRES

providers from complying with all applicable federal, state, and local laws."   Ohio Rev. Code §

4901.1-21-02(D) (2014).

The Ohio Supreme Court has found that "The jurisdiction specifically conferred by statute

upon the Public Utilities Commission over public utilities of the state, including the regulation of

rates and the enforcement of repayment of money collected * * * during the pendency of the

---

[2]  Ohio Rev. Code § 4905.01 is a definitions section.  Ohio Rev. Code § 4905.31
addresses "reasonable arrangements" permitted contracts between two public utilities or between
a public utility and one or more of its customers, consumers, or employees.  Ohio Rev. Code §
4905.33(B) prohibits public utilities from furnishing free services or pricing their services below
cost for the purpose of destroying competition.  Ohio Rev. Code § 4905.35 prohibits public
utilities from giving "any undue or unreasonable preference or advantage to any person, firm,
corporation, or locality." Ohio Rev. Code §§ 4933.81 to 4933.90 deal with the territories granted
to the companies who generate and deliver electricity.

proceeding * * * is so complete, comprehensive and adequate as to warrant the conclusion that it is likewise exclusive." *Hull v. Columbia Gas of Ohio*, 850 N.E.2d 1190, 1194 (Ohio 2006) (*citing State, ex rel. Ohio Bell Telephone Co. v. Court of Common Pleas*, 197 N.E. 787, 788-89 (Ohio 1934)).  In *Hull*, the court held that "PUCO has exclusive jurisdiction to oversee filed tariffs and to adjudicate complaints concerning rates to be charged to its customers," based on its statutory authority.  *Hull*, 850 N.E.2d at 1194.

Weaver asserts that there is no precedent in Ohio law on the issue of PUCO's exclusive jurisdiction over a CRES, and this Court agrees.[3]  (Doc. No. 15 at 6.)  It is undisputed that PUCO does not directly regulate the prices CRESs charge, as it does with rates charged by public utilities. (Doc. No. 7 at 6; Doc. No. 15 at 10.)   PUCO did not certify NAPG's pricing scheme.  The plain language of the statue limits PUCO's exclusive jurisdiction over CRESs to "any service for which it is subject to certification."   Ohio Rev. Code § 4928.16 (1999). The Ohio Supreme Court's recognition of PUCO's exclusive jurisdiction over rates, rules, and business practices relating to the sale of electricity by public utilities is based on the existence of a "complete, comprehensive and adequate" regulatory scheme addressing those functions.  *Hull*, 850 N.E.2d  at 1194.  The same statues that set forth that scheme specifically exempt CRESs from the vast majority of its regulations, including those that concern the setting of rates for consumers, furthering the legislative goal of creating a freer market for retail electric service.  These areas which are not regulated by PUCO cannot be subject to its exclusive jurisdiction.

This conclusion is reinforced by the fact that all but two of the cases cited by NAPG for the

---

[3]  Weaver cites to a ruling from the Illinois Supreme Court, but due to that state's distinct regulatory scheme, it is not dispositive of the issue.  (Doc. No. 15 at 6-7.)

proposition that PUCO has exclusive jurisdiction over Weaver's claims concern disputes between consumers and public utilities.  (Doc. No. 7 at 6-10.)  In *Hull*, discussed *supra*, the plaintiff's claims arose from the breach of contract by a natural gas marketer which failed to deliver promised gas and was therefore terminated from the public utility's "Customer Choice" program.[4]  The court ruled that the issue of whether "PUCO may have lacked jurisdiction over marketers like Energy Max when Hull contracted with Energy Max" was irrelevant in that case, given that  the "entirety" of that plaintiff's claim against the defendant Columbia Gas, a public utility, was "the rate he believes he should have been charged for his natural gas service."  *Hull*, 110 Ohio St. 3d at 103.  In the second case involving a CRES, *Saks v. East Ohio Gas Co.*, 971 N.E.2d 498 (Ohio Ct. App. 2012), the public utility raised a jurisdictional issue under Ohio Rule of Civil Procedure 12(B)(1), and the court held that PUCO had exclusive jurisdiction over the public utility.  *Saks*, 971 N.E.2d at 501-03.  The non-public "company supplying natural gas" involved in the case did not argue that PUCO had jurisdiction over the claims asserted against it, and instead moved for judgment on the pleadings under Ohio Rule of Civil Procedure 12(C), which was granted.[5]  *Id.* at 503.  Ohio courts have not addressed the issue of whether PUCO has exclusive jurisdiction over the a natural gas marketer or supplier, let alone a CRES.

The parties are also in agreement that the test set forth in the Ohio Supreme Court's *Allstate*

---

[4]  Further complicating the relevance of that decision, the events in *Hull* occurred in 1999-2000, and the statues at issue here, Ohio Rev. Code §§ 4929.20 through 4929.30, became effective June 26, 2001.  *Hull*, 850 N.E.2d at 1192-95.   As the court in *Hull* noted, it is not clear that PUCO had any jurisdiction over marketers before that date.  *Id.* at 102.

[5]  The *Saks* court explained that "the CSPA generally excludes transactions between a utility . . . or a company supplying natural gas . . . and its customers from the scope of "consumer transactions" covered by the statute. R.C. 1345.01(A). Thus, [Plaintiff's] CSPA claims fail as a matter of law," as discussed in section D, *infra*.  *Saks v. E. Ohio Gas Co.*, 971 N.E.2d 498, 503 (Ohio Ct. App. 2012).

decision is inapplicable here, albeit for different reasons.  (Doc. No. 7 at 9-10, Doc. No. 15 at 9.)
The *Allstate* test is was set forth by the Ohio Supreme Court in *Allstate* "[t]o help us and all other
courts determine when a trial court's determination that it, not PUCO, has jurisdiction over a case
involving a *public utility* alleged to have committed a tort."  *Allstate Ins. Co. v. Cleveland Elec.
Illum. Co.*, 893 N.E.2d 824, 827 (Ohio 2008) (emphasis added).  Since there is no public utility
involved in this case, and the regulatory scheme for CRESs is significantly different from that for
public utilities under Ohio law, that test cannot resolve the issue of jurisdiction.

For the reasons set forth above, the undersigned recommends Defendant's motion to dismiss
for lack of subject matter jurisdiction under Federal Rule of Civil procedure 12(b)(1) be DENIED.

**D.    CSPA**

Defendant next moves for dismissal of Weaver's Complaint because the claims are excluded
by the Ohio Consumer Sales Protection Act ("CSPA").  (Doc. No. 7 at 10.)  In his Complaint,
Weaver claimed that NAPG violated the CSPA by charging rates for electricity that were higher than
those readily available to similar consumers in violation of Ohio Rev. Code § 1345.03(B)(5);
incorporating terms in its contract that allowed NAPG to unilaterally alter the contract in violation
of Ohio Rev. Code §§ 1345.02-03; failing to incorporate all material terms in its contract in violation
of Ohio Rev. Code § 1345.02; and deceptively asserting that its pricing was based on market
conditions in violation of Ohio Rev. Code §§ 1345.02(A) and 1345.02(B)(8).  (Doc. No. 16-17.)

The CSPA defines a "Consumer transaction" as:

a sale, lease, assignment, award by chance, or other transfer of an item of goods, a
service, a franchise, or an intangible, to an individual for purposes that are primarily
personal, family, or household, or solicitation to supply any of these things.

Ohio Rev. Code § 1345.01 (2018).  The definition explicitly excludes "transactions between persons,

defined in sections 4905.03 and 5725 .01 of the Revised Code, and their customers." (*Id.*)  The "persons defined in sections 4905.03 . . . of the Revised Code" include "[a]n electric light company, when engaged in the business of supplying electricity for light, heat, or power purposes to consumers within this state, including supplying electric transmission service for electricity delivered to consumers in this state."  *Id.*;  Ohio Rev. Code § 4905.03(C) (2012).

The threshold issue for Weaver's CSPA claims is whether NAPG is an "electric light company" under the statue, and thus excluded from the scope of the CSPA.  NAPG argues that it is, because it is "engaged in the business of supplying electricity to consumers within the state of Ohio."  (Doc. No. 7 at 11.)  Weaver contends that it is not, because the Ohio Rev. Code § 4928.01 defines an "electric services company" as distinct from an "electric light company."  (Doc. No. 15 at 11.)

The statue which authorizes CRESs,  Ohio Rev. Code §  4928.01, sets forth the following definitions:

> "Electric light company" has the same meaning as in section 4905.03 of the Revised Code and includes an electric services company, but excludes any self-generator to the extent that it consumes electricity it so produces, sells that electricity for resale, or obtains electricity from a generating facility it hosts on its premises.
>
> * * *
>
> "Electric services company" means an electric light company that is engaged on a for-profit or not-for-profit basis in the business of supplying or arranging for the supply of only a competitive retail electric service in this state. "Electric services company" includes a power marketer, power broker, aggregator, or independent power producer but excludes an electric cooperative, municipal electric utility, governmental aggregator, or billing and collection agent.

Ohio Rev. Code § 4928.01(A)(7), (9) (2019).

The Ohio Supreme Court has held that "[t]he primary rule in statutory construction is to give effect to the legislature's intention. . . . To ascertain the legislative intent, courts rely upon ordinary

principles of statutory construction." *Cline v. Ohio Bur. of Motor Vehicles*, 573 N.E.2d 77, 80 (Ohio 1991) (citing *Stewart v. Trumbull Cty. Bd. of Elections*, 296 N.E.2d 676, 677 (Ohio 1973)).  The Court has explained that "intent is primarily determined from the language of the statute itself. . . . If the statute is determined to be ambiguous, the Revised Code provides additional tests for determining legislative intent."[6]  *Stewart*, 296 N.E.2d at 677 (citation omitted).

Weaver claims that the meaning of the statue is unambiguous: because the definition of "electric light company" in Ohio Rev. Code § 4928.01(A)(7) states that this definition "has the same meaning as in section 4905.03 of the Revised Code and includes an electric services company," it follows that the two are "separate and distinct."  (Doc. No. 15 at 11-12.)  This Court disagrees.

In the case cited by NAPG, *Saks v. East Ohio Gas Company*, the Ohio Court of Appeals, Eighth District, held that "the CSPA generally excludes transactions between a utility . . . or a company supplying natural gas . . . and its customers from the scope of 'consumer transactions' covered by the statute.  R.C. 1345.01(A).  Thus, [Plaintiff's] CSPA claims fail as a matter of law." *Saks*, 971 N.E.2d at 503.  The statutory definition of a "natural gas company" is similar to that of an electric light company: a company "engaged in the business of supplying natural gas for lighting, power, or heating purposes to consumers within this state." Ohio Rev. Code § 4905.03(D) (2012).

NAPG is indisputably "engaged in the business of supplying electricity for light, heat, or power purposes to consumers within this state," which is the definition of an "electric light company" under Ohio Rev. Code § 4905.03(C) (2012).  Both a plain reading of the statue and the

---

[6]  The pertinent statue provides that, "if a statute is ambiguous, the court, in determining the intention of the legislature, may consider among other matters: (A) The object sought to be attained; (B) The circumstances under which the statute was enacted; (C) The legislative history; (D) The common law or former statutory provisions, including laws upon the same or similar subjects; (E) The consequences of a particular construction; (F) The administrative construction of the statute."  Ohio Rev. Code § 1.49 (1972).

ruling in *Saks* lead to the conclusion that Weaver's claims against NAPG are excluded by the CSPA. Because this Court finds that NAPG is an "electric light company" under the CSPA, it is not necessary to consider the parties next dispute: whether Weaver adequately pleaded a violation of the CSPA.  For the reasons set forth above, the undersigned recommends Defendant's Motion to Dismiss Plaintiff's claims under the CSPA (the First Cause of Action in Plaintiff's Complaint) be GRANTED.

**E.      Breach of Contract**

Weaver also alleged that NAPG breached their contract by charging a variable rate that was "not based on market conditions, including the wholesale price of energy."  (Doc. No. 1 at 18.) NAPG argues that Weaver has failed to state a claim for breach of contract because the allegations in his Complaint "do not plausibly assert the breach of an actual contract."  (Doc. No. 7 at 14.) Weaver contends that he pled sufficient facts to support his claim.  (Doc. No. 15 at 15.)

Breach of contract in Ohio requires: "(1) a binding contract or agreement was formed; (2) the nonbreaching party performed its contractual obligations; (3) the other party failed to fulfill its contractual obligations without legal excuse; and (4) the nonbreaching party suffered damages as a result of the breach." *Carbone v. Nueva Constr. Grp., L.L.C.*, 83 N.E.3d 375, 380 (Ohio Ct. App. 2017).  Here, the parties agree that a binding contract was formed, with the terms set forth in the "Terms of Service" provided to Weaver by NAPG after he agreed to enroll in NAPG's service. (Doc. No. 1 at 8; Doc. No. 7 at 3.)  The parties do not dispute that Weaver performed his contractual obligations.  (Doc. No. 1 at 19.)  At issue in this case are the third and fourth steps of the test: whether NAPG failed to perform its contractual obligations without legal excuse, and whether Weaver suffered damages as a result.

The contract provision in dispute states that:

Customer Price per kWh will be established and vary each month, based on factors, including but not limited to, the costs incurred by NAP to provide the Service, through procurement in RTO-administered and/or other short term markets, as well as the costs for supply and associated products that NAP requires to meet your electric generation supply requirements (including, without limitation, energy, imbalance energy, losses, capacity, transmission, ancillary services, alternative and renewable energy requirements, other RTO charges, taxes and other required products or services) . . . . The Variable Rate will be set at NAP's discretion and may vary month-to-month based on NAP's assessment of applicable market conditions, and publically available data and indices, historic and projected supply and hedging costs, prior month pricing and balancing costs, projected average customer billing amounts and Utility pricing.  Customer Variable Price may be higher or lower than the price offered in the initial or any following months while NAP is providing Supply Service.  Savings are not guaranteed.

(Doc. No. 1, Ex. 1 at 1.)

Weaver argues that NAPG breached the contract "because it charged a variable rate not based on market conditions, including the wholesale price of energy."  (Doc. No. 1 at 19.)  He points out that after an initial rate hike when his contract first converted from a fixed to a variable rate, his rates consistently rose by $0.01 kWh/month, while NAPG's fixed rate remained unchanged and the rates charged by his public utility trended downward.  (Doc. No. 1 at 9-10.)  NAPG counters that, by the plain language of the contract, it was permitted to base its rates on more than "market conditions, including the wholesale price of energy," and that it clearly explained there was a "discretionary component" to its rate-setting.  (Doc. No. 7 at 15.)

In evaluating a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all of Plaintiff's factual allegations as true, and construe the Complaint in the light most favorable to the Plaintiff.  *Erickson*, 551 U.S. 89, 94 (2007).  A claim has facial plausibility, as required to avoid dismissal for failure to state a claim, when a plaintiff pleads factual content that allows court to draw reasonable inference that a defendant is liable for

14

the misconduct alleged.  *Iqbal*, 556 U.S. at 678.  Further, where contract terms are ambiguous, they present a triable issue of fact that cannot be resolved in a motion to dismiss.  *Schwebel Baking Co. v. FirstEnergy Sols. Corp.*, No. 4:17CV0974, 2018 WL 1419477, at *4 (N.D. Ohio Mar. 21, 2018); *More Than Gourmet, Inc. v. Christian Potier, S.A.*, No. 5:13CV1966, 2014 WL 4245961, at *6 (N.D. Ohio Aug. 26, 2014)

The sentence at the heart of the disagreement over the Terms of Service states that "[t]he Variable Rate will be set at NAP's discretion and may vary month-to-month based on NAP's assessment of applicable market conditions, and publically available data and indices, historic and projected supply and hedging costs, prior month pricing and balancing costs, projected average customer billing amounts and Utility pricing."  (Doc. No. 1, Ex. 1 at 1.)  NAPG argues that there are no contract terms obligating it to tie its variable rate to any other published rate.  (Doc. No. 7 at 15.) However, Weaver's argument is that the consistent, incremental upward trend in his bills, when compared to the more volatile fluctuation in the price charged by his public utility or the variations in pricing from other CRESs, evidences a pricing strategy that is not based on the listed factors. (Doc. No. 1 at 2-3; Doc. No. 15 at 16-17.)  This is a plausible argument, and distinct from the arguments in the cases cited by NAPG, which held that neither the wholesale electric price nor the rates charged by a local utility were valid comparators to rates charged by an energy supplier.

In *Sevugan v. Direct Energy Services*, the Seventh Circuit considered a case in which the contract between the energy supplier and the consumer stated that the energy supplier would charge a variable rate based on "prevailing market prices for electricity . . . plus an adder, determined solely by [the supplier] in its discretion." *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 613 (7th Cir. 2019). The Court held that public utilities are not proper comparators for determining the

15

"prevailing market prices" for retail energy suppliers, because the utilities' pricing is regulated, while the retail energy suppliers' pricing is market-based.  *Id.* at 618.  Unlike the contract at issue in this case, that contract expressly state that the supplier was inflating the consumers' price with "an adder, determined solely by [the supplier] in its discretion."  *Id.* at 613.  It did not imply that the supplier was using its discretion to evaluate listed factors, which would be the basis for the price.

In *Richards v. Direct Energy Services,* the Second Circuit upheld a grant of summary judgment on a similar breach of contract claim.  *Richards v. Direct Energy Servs*., LLC, 915 F.3d 88 (2d Cir. 2019).  The Court explained that public utilities are not proper comparators for retail energy suppliers, because the utilities pricing is regulated, while the retail energy suppliers pricing is market-based.  *Id.* at 99.  However, in that case, the contract at issue stated that "[a]fter the Initial Term and during the Renewal Period, the rate for electricity will be variable each month at [the supplier's] discretion."  *Id.* at 97.  Again, this sets forth a broader exercise of discretion than that specified by the contract at issue here.  Further, the breach of contract claim survived an earlier motion to dismiss, and summary judgment was granted based on discovery and expert testimony which proved that the supplier "set the variable rate to achieve a target profit margin, match competitors' prices, and reduce customer losses, among other objectives.  As a matter of plain meaning, these sorts of considerations constitute 'business and market conditions.'" *Id.* at 98.  It may be that the monthly $0.01/kWh increases described by Weaver in his Complaint are not arbitrary, and do reflect the factors listed in the Terms of Service, but this is a factual question that cannot be resolved by examining the pleadings.

NAPG cites additional cases for the proposition that it neither wholesale nor public utility rates are sufficient comparators to demonstrate that a retail electric supplier's rates are not based on

factors disclosed in the specific contracts at issue in those cases.  (Doc. No. 7 at 16-17.)  However, none of those cases describe a rate that persistently increased at such a consistent amount as the one described in Weaver's Complaint.  Further, Weaver, in his Complaint, also alleges that the variable rate he was charged did not "vary based on competitors' rates."  (Doc. No. 1 at 2.)  NAPG's competitors are other CRESs, as well as the public utilities.  While Weaver does not plead information about the rates of other CRESs with any greater specificity, he is not required to at this early stage of the litigation.  His Complaint makes clear that his claim is not solely reliant on a comparison between NAPG's rates and the rates charged in the wholesale or by public utilities, as NAPG claims.

Weaver also cites cases from other circuits where similar breach of contract claims survived motion to dismiss.  (Doc. No. 15 at 17.)  In *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173 (2d Cir. 2019), the Second Circuit overruled a District Court grant of summary judgment against an electric supplier.  In *Mirkin*, the contract between the parties stated "Your monthly variable rate is based on [the electric supplier's] actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs."  The Court held that it was plausible for the Plaintiff to believe"[t]he cost of wholesale energy is the primary component of the non-overhead costs [the electric supplier] incurs." *Id*. at 177.  The Court explained it "must therefore draw the reasonable inference from the Complaint . . .that [the electric supplier's] actual or estimated supply costs should track the Market Supply Cost," and found the District Court had erred in dimissing the complaint for failure to state a claim of breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment.  *Id.*

Similarly, in *Basile v. Stream Energy Pennsylvania, LLC*, the contract between the parties

17

stated that the variable rate plan's prices "may fluctuate and [are] subject to change at the sole discretion of [the electric supplier], based upon the fluctuation of wholesale natural gas prices or other inputs to wholesale electric prices[.]" *Basile v. Stream Energy Pennsylvania, LLC*, No. 1:15-CV-01518, 2016 WL 4611443, at *1 (M.D. Pa. Sept. 6, 2016). The District Court found that summery judgment was inappropriate because the contract "undisputedly requires Defendants to set rates that have a basis in "natural gas prices or other inputs" and "Plaintiff plainly alleges that Defendants' rate changes 'bore no reasonable relationship to market conditions.'" *Id.* at *4.

Weaver's breach of contract claim is plausible under the generous pleading standards of Federal Rule of Civil Procedure 12(b)(6). The issue of whether the Terms of Service granted NAPG complete discretion, or discretion to evaluate the listed factors, is at best ambiguous, and creates a triable issue of fact that cannot be resolved at this early stage of litigation. The consistent rate of increase in the price per kWh charged to Weaver under the variable rate plan makes his contention that price was not based on the listed factors in the contract plausible. Therefore, the Court recommends that the motion to dismiss Weaver's breach of contract claim be DENIED.

**E.        Breach of Implied Covenant of Good Faith and Fair Dealing**

The third and final cause of action in Weaver's Complaint alleges that NAPG "breached its implied covenant of good faith and fair dealing by arbitrarily and unreasonably exercising its unilateral rate-setting discretion to price-gouge and frustrate Plaintiff and other Class Members' reasonable expectations that the variable rate for electricity would reflect market conditions." (Doc. No. 1 at 20.)

Under Ohio law, "every contract imposes an implied duty of good faith and fair dealing in its performance and enforcement." *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 469 (Ohio

18

2018) (citation omitted)  This "implied covenant of good faith and fair dealing . . . requires not only honesty but also reasonableness in the enforcement of the contract."  *JCV 671, LLC v. MMA Mgmt., LLC*, 579 F. Supp. 2d 909, 912 (N.D. Ohio 2008) (citing *Littlejohn v. Parrish*, 839 N.E.2d 49, 54 (Ct. App. 2005)).  The court in *Littlejohn v. Parrish* explained that "implied duty of good faith and fair dealing 'is generally used to effectuate the intentions of the parties or to honor their reasonable expectations' and 'applies when one party has discretionary authority to determine certain terms of the contract.'"  *Littlejohn*, 839 N.E.2d at 54 (citation omitted).

NAPG argues that Weaver failed to explain how NAPG's alleged actions impeded his right to receive benefits that he reasonably expected to receive under his contract with NAPG, or even identify the benefit of which he was deprived.  (Doc. No. 7 at 18.)  Further, NAPG argues that Weaver's claim for breach of the implied covenant of good faith and fair dealing cannot survive independently of his breach of contract claim, which it asserts should be dismissed.  (*Id*. at 19.)  Weaver argues that his claims are pled with sufficient specificity, and arise from NAPG's abuse of its discretion in setting the variable-rate price.  (Doc. No. 15 at 19.)  Weaver asserts that he "reasonably expected that NAPG would charge a rate that would result in profit for NAPG, but also expected the rate to reflect market conditions and remain competitive with other providers."  (Doc. No. 15 at 20.)

The undersigned concludes that, as in *Basile*, "Plaintiff's complaint plainly alleges damages in the form of higher electricity costs."  *Basile*, 2016 WL 4611443, at *4.  Since the Court believes that Weaver's breach of contract allegations should survive summary judgment, it is not necessary to address the disputed issue of whether Ohio law permits a claim of implied covenant of good faith and fair dealing can exist independent of a breach of contract claim.  Here, those claims are

19

intertwined.  If NAPG was abiding by the terms of the contract by setting prices based on the factors set forth in the Terms of Service, it cannot have been in breach of its duty of good faith and fair dealing.  *CosmetiCredit, L.L.C. v. World Fin. Network Natl. Bank,* 24 N.E.3d 762, 774 (Ohio Ct. App. 2014) ("Under the law generally applicable to contracts as outlined above, a contracting party is entitled to enforce the terms of the contract as written, and bad faith could not attach to such enforcement of explicit contractual rights.") citing *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 662 N.E.2d 1074, 1082 (Ohio 1996) ("Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.'")  If, however, it was setting its prices without reference to the factors listed in the contract, than it may have both breached its duty and injured Weaver by taking opportunistic advantage of its discretion in rate-setting.  As in *Basile*, " Plaintiff's complaint plainly alleges damages in the form of higher electricity costs." *Basile*, 2016 WL 4611443, at *4.  This is a mixed question of fact and law, so it must survive a motion to dismiss.  Therefore, the Court recommends that the motion to dismiss Weaver's breach of the implied covenant of good faith and fair dealing be DENIED.

## VI. Conclusion

For all of the foregoing reasons, it is recommended that the Court GRANT IN PART and DENY IN PART Defendant's Motion to Dismiss.  The Motion to Dismiss Plaintiff's entire Complaint based on a lack of jurisdiction should be DENIED.   The Motion to Dismiss the first count of Plaintiff's Complaint, alleging a violation of the CSPA, should be GRANTED.  The Motion

to Dismiss second and third counts of Plaintiff's Complaint, alleging breach of contract and breach of the covenant of good faith and fair dealing, should be DENIED.


Date: December 16, 2019                                    s/ *Jonathan D. Greenberg*
                                                           Jonathan D. Greenberg
                                                           U.S. Magistrate Judge



## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**